# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00448-CV

---

**D. J. and A. S., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 300,832-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

After the trial court signed an order terminating A.S.'s parental rights to her sons, who were two and four years old at the time of the final hearing, A.S. and D.J., grandmother to the children, filed notices of appeal. Mother's appointed attorney has since filed a brief concluding that her appeal is frivolous and without merit.[1] Grandmother has filed a pro se brief complaining of the trial court's refusal to place the children in her care. We will affirm the trial court's order of termination.

---

[1] *See In re P.M.*, 520 S.W.3d 24, 27-28 (Tex. 2016) ("Counsel's obligation to the client may still be satisfied by filing an appellate brief meeting the standards set in *Anders v. California*, [386 U.S. 738 (1967),] and its progeny."); *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 646-47 & n.4 (Tex. App.—Austin 2005, pet. denied).

# BACKGROUND

For a trial court to terminate a parent's rights to their child, the Texas Department of Family and Protective Services must prove by clear and convincing evidence that the parent engaged in conduct that amounts to a statutory ground for termination and that termination is in the child's best interest. Tex. Fam. Code § 161.001; *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). The Department filed a petition seeking to terminate the parental rights of A.S. and the children's fathers,[2] alleging that A.S. was using drugs while she was supposed to be caring for the children and that there were concerns about her mental health and parenting abilities. D.J. hired an attorney, who filed a petition in intervention on her behalf about two months before the final hearing asking to be named sole managing conservator. After her petition in intervention was filed, the Department filed a final report in which it named D.J. as a person entitled to notice of hearing and stated that it had done a home study for her as requested. The Department explained that it had rejected D.J. as a placement because she and A.S.'s father, with whom D.J. lived, were not "forthcoming about their criminal history" and because it was concerned that D.J. "will not be protective since she minimizes [A.S.'s] behaviors and would not comply with the court order regarding supervised visits and allow [A.S.] access to [the children] if they are placed in the home." The Department explained that D.J. had admitted that A.S. stays with her "since she does not have anywhere else to stay" and that D.J. cannot handle A.S. "when she is under the influence of drugs or having a manic episode." Finally, the Department reported that one of the boys "expressed concerns about being beat by his grandma who he refers to as 'nana.'"

---

[2] Two men were named as legal father or alleged father, and both of their parental rights were terminated. Neither is a party to this appeal.

At the final hearing, D.J. was noted by the trial court as being present and representing herself. Department witnesses testified and reiterated the Department's objections to D.J.'s request to be the children's caretaker. D.J. was allowed to question witnesses, and when she was called to testify, the trial court allowed her to "come back up and tell" the court anything she had not yet had a chance to say. D.J. testified on her own behalf and denied hitting her grandson, acknowledged that A.S. had "issues," insisted that she would be protective of the children, and said that she wanted to adopt the boys. At the conclusion of the hearing, the trial court asked D.J. if she wanted to make a closing argument or summarize her position, and D.J. responded, "No, I just believe that the boys belong with me." The trial court made a verbal ruling that it would terminate the parents' rights and appoint the Department as conservator.

Two weeks later, D.J., through a new attorney, filed a motion for new trial, asserting that she was entitled to a new trial because her attorney did not appear at the final hearing and the trial court had not tried to determine the cause of his absence or whether D.J. was prepared for trial. The trial court held a hearing, during which D.J.'s new attorney clarified that he was not seeking a new trial as to the termination decision but only as to D.J., "who filed the petition to intervene to seek custody," and argued that D.J. received insufficient notice of the final hearing and was unfairly left without representation at the hearing. The Department responded, explaining that the case was supposed to be heard by an associate judge in November 2018 but that the associate judge recused himself the day of the scheduled hearing because D.J. and other family members had "bombarded" him with letters "outside of evidence." As a result of the recusal, the matter was set for final hearing before the referring trial court in May 2019, and the Department insisted that D.J. had more than forty-five days' notice of that trial setting. The Department also asserted that at the November hearing, the associate judge had allowed

3

D.J.'s attorney to withdraw, and that D.J. chose not to hire new counsel before the May 2019 hearing and that she instead waited to see whether she would like the trial court's decision. The trial court denied D.J.'s motion for new trial and signed its final decree of termination, naming the Department as managing conservator.

## DISCUSSION

D.J. does not dispute the sufficiency of the evidence supporting the termination of the parents' rights. She instead contends that her request to be named the children's conservator or placement was not given fair treatment by the trial court. Specifically, D.J. asserts that the trial court did not "consider" her rights "as Grandmother of the children," did not allow her to intervene, wrongfully proceeded to trial without allowing her to have legal representation, did not allow her to present her case, did not give her an opportunity to conduct full discovery, failed in its "role as an independent party," and "did not afford equality of arms" to her.[3]

First, we note that D.J. was permitted to intervene in the proceeding and to cross-examine witnesses and testify on her own behalf at trial. Further, although an indigent parent has a statutory right to effective counsel in a parental-rights termination case, that right does not extend to grandparents. *In re B.L.M.*, No. 02-07-00214-CV, 2008 WL 1867141, at *11 (Tex. App.—Fort Worth Apr. 24, 2008, no pet.) (mem. op.); *In re J.S.*, No. 02-04-00277-CV, 2005 WL 1693537, at *5 (Tex. App.—Fort Worth July 21, 2005, no pet.) (mem. op.). Thus, the fact

---

[3] "Equality of arms" is a concept "created by the European Court of Human Rights in the context of the right to a fair trial" that requires a fair balance of opportunities afforded to all parties to a litigation, such as the ability to call and cross-examine witnesses, and that may in some circumstances require "the provision of financial support to allow a person of limited means to pay for legal representation." Oxford Reference, *Equality of Arms*, http://https://www.oxfordreference.com/view/10.1093/oi/authority.20110803095755504 (last visited October 18, 2019).

that D.J. was not represented by counsel at the final hearing and any complaints she has related to the quality of assistance she received from her trial attorneys before that hearing are not grounds for reversal. *See B.L.M.*, 2008 WL 1867141, at *11; *J.S.*, 2005 WL 1693537, at *5; *see also In re H.M.J.H.*, 209 S.W.3d 320, 322 (Tex. App.—Dallas 2006, no pet.) (grandparent's decision to proceed pro se at trial did not alter her burden). Finally, any assertions D.J. has about the proceeding being "fixed" or unfair are not briefed in such a way that we can consider their merits. *See B.L.M.*, 2008 WL 1867141, at *11-12. We next consider the evidence as it relates to the trial court's conservatorship decision.

If the trial court terminates both parents' rights to their children, as it did in this case, the court must appoint a suitable, competent adult; the Department; or a licensed child-placing agency as managing conservator of the child. Tex. Fam. Code § 161.207(a). In reviewing that decision, we apply an abuse-of-discretion standard and will reverse only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.). The primary consideration in a conservatorship decision is always the best interest of the child, Tex. Fam. Code § 153.002, and in making or reviewing a conservatorship decision, courts must consider the factors set out in the family code, *id.* § 263.307(b),[4] and *Holley v. Adams*, 544 S.W.2d 367,

---

[4] Prompt and permanent placement in a safe environment is presumed to be in a child's best interest, and the Department and the courts should consider factors including the child's age; any physical and mental vulnerabilities; the harm suffered by the child; whether the child fears living in or returning home; psychiatric, psychological, or developmental evaluations of the child and his family members; any history of abuse or substance abuse by family members or others who have access to the home; the openness of the proposed placement to counseling services and supervision; the placement's parenting skills and openness to making necessary changes within a reasonable period of time; and whether the placement has an adequate support system. Tex. Fam. Code § 263.307.

371-72 (Tex. 1976).[5]  There is no statutory presumption that a grandparent should be preferred as managing conservator over the Department or other non-parents.  *A.C.*, 394 S.W.3d at 644; *In re J.R.P.*, 55 S.W.3d 147, 152 (Tex. App.—Corpus Christi-Edinburg 2001, pet. denied).

When reviewing the sufficiency of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses."  *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).  In evaluating the legal sufficiency of the evidence, we look at "all the evidence in the light most favorable to the finding" to determine whether a reasonable factfinder could reach the trial court's conclusion.  *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *Williams v. Williams*, 150 S.W.3d 436, 449 (Tex. App.—Austin 2004, pet. denied).  We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible."  *J.F.C.*, 96 S.W.3d at 266.  In considering factual sufficiency, we consider the entire record and ask whether the "disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding."  *Id.*

The Department introduced into evidence its removal affidavit, which recited that in June 2018, it received a report that A.S. had walked with her children to a hospital, where she told staff "she could not take care of her children any longer for fear of harming them out of

---

[5] In determining a child's best interest, courts should consider his wishes; his present and future emotional and physical needs; emotional and physical danger to the child now and in the future; parenting skills of those seeking custody; programs available to assist those individuals; the competing plans for the child; the stability of the possible placements; the parents' acts or omissions indicating that the existing parent-child relationship is not a proper one; and any excuse for those acts or omissions.  *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

frustration." A.S. explained that she and the children had been left at D.J.'s house without any food or means to get any food and that the children kept crying because they were hungry. A.S. told the investigator that she "has untreated mental health [issues] and is diagnosed with bipolar disorder, schizophrenia, anxiety, and postpartum depression" but that she does not take any medication and had not filled a prescription a hospital had given her. She said she had been to the hospital at least three times in the last month and went once in early May 2018 because she was using methamphetamines. She claimed that she had not used since that time but that she had been selling methamphetamines "to help provide for her children." The Department decided to remove the children in early June, when D.J. "came running out of [her] house stating that 9-1-1 needs to be called due to [A.S.] fighting in the house." The Department investigator who was present heard "audible screaming" and saw A.S. in a violent struggle with her brother, "ripping things off of shelves, moving furniture, and hitting and kicking others in the home." After A.S. was arrested, D.J., A.S.'s father, and A.S.'s brother all received medical attention. The children, who were present during the incident, were then removed into Department care.

At trial, the Department caseworker explained the Department's decision to oppose the placement of the children with D.J., testifying that D.J. could not control A.S. physically and that if A.S. were to go to D.J.'s home, "there's no way that she's able to control" A.S. and protect the children. D.J. also "continues to make excuses for" A.S. and "minimizes the criminal history and the mental health and the drug use." The caseworker said that during the proceeding, D.J. had not been honest about whether A.S. was living with her and that the Department therefore feared that if D.J. was given custody, she would still allow A.S. to live with her and "would not comply with the visitation orders." The caseworker further noted that D.J. continued to drive despite not having a valid driver's license and that the older child said

7

that D.J. had "whooped" him. Finally, the caseworker testified that A.S.'s father, who lived with D.J., did not want to adopt the boys and that it "would be difficult for [the children] to live there and [A.S.'s father] to be caregivers [sic] when he doesn't want to adopt them." The caseworker testified that the older boy was currently in a "specialized" foster home due to "extreme behaviors" that he exhibited when he was first removed, including "major tantrums about three times a day." He had been participating in therapy for several months, and his behavior had "improved tremendously," and once his behavior normalized, the Department hoped to move him into the same foster home with his brother. The younger child was thriving and "doing really well" and was "very attached" to his foster parents.

The children's guardian ad litem testified that she opposed the appointment of D.J. as the children's conservator because D.J. allowed A.S. to live with her and because the children were removed from A.S.'s care while they and A.S. were living with D.J. "after witnessing an incident of extreme violence in the home." She said that D.J.'s failure to seek assistance with A.S.'s issues:

> led to the children being in an atmosphere that was not conducive to their best interest, being exposed to domestic violence, being exposed to the violence in the home that on that particular incident, according to the removal affidavit, you and [A.S.'s father] had to receive medical attention. This occurred when the children were in the home. That is a dangerous situation for children.

The guardian ad litem also said that D.J. had not been "completely honest with the Department" about whether A.S. lived with her during the proceeding. She believed it was in the boys' best interest to remain in their current placements and echoed the caseworker's hopes that the older child could soon be placed with his brother and that the two boys would be adopted together.

D.J. explained that her driver's license had been suspended due to unpaid tickets and that she was working on regaining it. D.J. said that although she lived with A.S.'s father, they were "not really together." She said she was in the process of buying a new home and that she earned enough money to support herself and the boys. She wanted to adopt them because "[t]hey're my grandkids, and I think the best place for them kids is with their family." D.J. said A.S. was "schizo, bipolar, like that," and said she would remind A.S. to take her medication but would not be able to force her to do so. Asked what she would do if the boys were placed with her and A.S. showed up at the house, D.J. said she would call the police. She also denied ever hitting her grandsons.

The record reflects that the children were present during a violent fight between A.S. and her brother, which occurred in D.J.'s home while D.J. was present. There was also evidence that A.S. had used drugs on at least one occasion and had sold drugs and given some of the money to D.J., although A.S. denied that D.J. knew the source of the money. D.J. had not been honest about whether she allowed A.S. to live with her during the proceeding, and both the caseworker and the children's guardian ad litem were concerned that she would not and could not protect the boys from A.S. The older child exhibited extreme behavior, which had improved since his removal, and the younger child was thriving and had bonded with his foster family. The Department hoped to place the boys together and for them to be adopted by that family.

On this record, considering the relevant statutory and *Holley* factors, we cannot conclude that the trial court abused its discretion in deciding that placement with D.J. was not in the children's best interest. *See J.A.J.*, 243 S.W.3d at 616; *A.C.*, 394 S.W.3d at 644.

9

**CONCLUSION**

We have overruled D.J.'s complaints on appeal. Further, in our review of the record, we agree with Mother's attorney that the appeal is frivolous and without merit. We affirm the trial court's order of termination.

_____
Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Triana and Smith

Affirmed

Filed: November 7, 2019